UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANGELO THOMPSON,

       Plaintiff,

v.                                                                    Civil Case No. 19-13081
                                                                      Honorable Linda V. Parker

RYOBI LIMITED, RYOBI TOOLS,
TECHTRONIC INDUSTRIES NORTH
AMERICA (TTI), ONE WORLD
TECHNOLOGIES, INC., and
THE HOME DEPOT,

       Defendants.
_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO STRIKE
(ECF NO. 76), GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (ECF NO. 60), AND DENYING AS MOOT DEFENDANTS'
OBJECTIONS (84) TO MAGISTRATE JUDGE'S ORDER**

This is a products liability action arising from severe injuries Plaintiff

suffered on September 25, 2016, when fuel from a gasoline powered generator

spilled on him and ignited.  The action remains pending only against Defendants

Techtronic Industries North America ("TTI") and One World Technologies, Inc.

("OWT") (collectively "Defendants").  Defendants previously filed a motion to

preclude Plaintiff from introducing evidence from certain expert witnesses and his

treating physicians, which Magistrate Judge David R. Grand granted in part and

denied in part.  (ECF No. 82.)  Before the Court are Defendants' objections to that

decision (ECF No. 84), as well as Defendants' summary judgment motion (ECF

No. 60).  Plaintiff filed three response briefs to Defendants' summary judgment

motion (ECF Nos. 72, 73, 74)—two of which were filed beyond the second

extended deadline Plaintiff received to respond to the motion (*see* 7/7/21 Text-

Only Order; ECF No. 70).  Defendants ask the Court to strike Plaintiffs' untimely

and duplicative response briefs.  (ECF No. 76.)

        While the Court is troubled by the multiple and untimely filings by

Plaintiff's counsel, it concludes that Defendants will not be prejudiced if the filings

are considered.  The Court is dispensing with oral argument with respect to

Defendants' summary judgment motion and concludes, for the reasons set forth

below, that the motion should be granted.  Therefore, the Court also concludes that

Defendants' objections to Magistrate Judge Grand's order are moot.

## I.      Summary Judgment Standard

        Summary judgment pursuant to Federal Rule of Civil Procedure 56 is

appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The central inquiry is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56

mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). Notably, the trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80

(6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact"); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."). The parties are required to designate with specificity the portions of the record such that the court can "readily identify the facts upon which the . . . party relies[.]" *InterRoyal Corp.*, 889 F.2d at 111.

## II.     Factual and Procedural Background

This lawsuit concerns a Ryobi gasoline powered generator, Model RY903600. OWT designed the generator. (Anderson Aff. ¶ 2, ECF No. 60-4 at Pg ID 972.) TTI did not have an active role in designing the generator but is OWT's parent. (*Id.*) This model generator was sold from 2015 through 2020, with 100,785 units distributed. (Defs. Resp. No. 4, ECF No. 60-5 at Pg ID 982.)

Plaintiff resides in an apartment on Jefferson Avenue in Detroit, Michigan. James Wadsworth, the owner of the building where Plaintiff's apartment is located, purchased the subject generator at a Home Depot on September 16, 2016. (Compl. ¶ 12, ECF No. 1 at Pg ID 15; Pl. Dep. at 141, ECF No. 60-2 at Pg ID 940.)

The subject generator was placed on a first-floor roof of the building and supplied power, when needed, to Plaintiff's apartment and an apartment occupied by the Banhams.  (Pl. Dep. at 159, ECF No. 60-2 at Pg ID 947; *see also* Cook/Buc PowerPoint at 4, ECF No. 72-1 at Pg ID 2328.)  During the twenty years Plaintiff resided in the building, generators were often used as a source of power when money was lacking to pay for electricity.  (Pl. Dep. at 141-42, ECF No. 60-2 at Pg ID 940-41.)  Plaintiff had experience using the generators and had read the operator's manuals for some of the generators and at least some of the manual for the subject generator.  (*Id.* at 142, 145-46, 166, Pg ID 941-43, 951.)  He could diagnose or troubleshoot operational or functional issues with the generators based on his experience.  (*Id.* at 165, Pg ID 950.)  Plaintiff was aware of the hazards of gasoline, including the prohibition of smoking while fueling one's car and that gasoline or gasoline vapors can ignite and burn and pose a risk of serious injury or death.  (*Id*. at 148-49, Pg ID 944-45.)

On September 25, 2016, while it was still light outside, the power went off in the building where Plaintiff resides.  (*Id*. at 226-27, Pg ID 954-55.)  Plaintiff went and sat inside his van for a while, listening to music and smoking, while he waited for Brook Banham to restart the generator.  (*Id*. at 166, 240, Pg ID 951.)  At approximately 9:30 p.m., Banham called Plaintiff and told Plaintiff that he could

not get the generator working.  (*Id*. at 240, Pg ID 956.)  Plaintiff went to the roof to

try and start the generator.  (*Id*.)

Plaintiff first checked the cords and the pilot switch and unsuccessfully tried

several times to start the generator.  (*Id*. at 255, Pg ID 959.)  He then checked to

see if the generator had enough gas.  (*Id*. at 252, 255, Pg ID 958, 959.)  Plaintiff

acknowledged that the generator was only knee-high and that he could have

removed the gas cap, bent down, and just looked inside to assess the fuel level.

(*Id*. at 259, Pg ID 960.)  Instead, he removed the gas cap, used the generator's

upright handle to tilt it, and shined his flashlight inside the gas tank, where he saw

that there was gas.  (*Id*. at 259, Pg ID 960.)  There was an "explosion" and Plaintiff

saw flames covering his pant legs.[1]  (*Id*. at 277-78, Pg ID 966-67.)  Plaintiff does

not know what ignited the fuel.  (*Id*. at 278, Pg ID.)

---

[1] In his response brief, Plaintiff asserts that he saw a "flickering flame" when he
looked inside the fuel tank to check the level of gasoline, he jumped to escape the
flame, and grabbed the generator's upright handle.  (Resp. Br. at 6, ECF No. 72 at
Pg ID 2316.)  Plaintiff does not cite to the record to support this version of the
events.  (*Id.*)  The Court has reviewed the sections of his deposition testimony
supplied by Defendants and Plaintiff and those sections do not support this version,
either.  (*See* Pl. Dep., ECF Nos. 60-2, 72-2, 72-3.)  Instead, Plaintiff testified that
he grabbed the generator's handle in order to tilt it and look inside to assess the
fuel level.  (Pl. Dep. at 259, ECF No. 60-2 at Pg ID 960; *id.* at 252, ECF No. 72-3
at Pg ID 2356.)

Hearing Plaintiff screaming, the Banhams went to the roof, where they saw flames but not Plaintiff.[2]  (Brook Banham Dep. at 62-63, ECF No. 73-4 at Pg ID 2415-16.)  They walked to the side of the building and saw Plaintiff on the ground below with his legs on fire.[3]  (*Id.* at 63, Pg ID 2416.)  There were some flames on the roof that Brook Banham extinguished with a fire extinguisher.  (*Id.* at 69-70, ECF No. 73-4 at PG ID 2419-20.)

Brook Banham then yelled to Plaintiff to ask if he was okay and whether Banham should call an ambulance.  (*Id.* at 70-71, Pg ID 2420-21.)  Plaintiff told him no, that he would have Wadsworth take him.  (*Id.* at 71, Pg ID 2421.)  Banham went back to bed but subsequently decided to check on Plaintiff.  (*Id.*)  Plaintiff was downstairs in his apartment and came upstairs to meet Banham, at which time

---

[2] Plaintiff asserts in his response brief that he "call[ed] ou[t] loud for help from his neighbor . . .."  (Pl. Resp. Br. at 7, ECF No. 72 at Pg ID 2317.)  There is no evidence to support this factual assertion, however.  The evidence only reflects that the Banhams heard Plaintiff screaming, and initially Brook Banham "did not really react too much, because [Plaintiff]'s a big screamer and he's always screaming out of frustration."  (Banham Dep. at 62, ECF No. 72-4 at Pg ID 2358.)  The Banhams only went to check on Plaintiff because Brooke's wife said that it did not sound like Plaintiff's "normal screaming."  (*Id.*)

[3] Plaintiff asserts in his brief that after his pants caught on fire, he "had the presence of mind, alertness, and analytical ability to head for the edge of the roof . . . and jump eighteen feet to the ground to save his life and to escape the fire."  (Pl. Resp. Br. at 7, ECF No. 72 at Pg ID 2317.)  There is no evidence cited to support the assertion that he consciously jumped from the building, nor is this assertion found in the portions of the transcript of Plaintiff's deposition attached to the parties' briefs.

Banham told Plaintiff he would take him to the hospital because Wadsworth was not nearby.  (*Id.* at 71-72, Pg ID 2421, 2422.)  Plaintiff went back downstairs to change his clothes and then Banham drove him to Detroit Receiving Hospital.  (*Id.*; *see also* Hosp. Records, ECF No. 60-8.)

Blood and urine samples were collected from Plaintiff at 1:56 a.m. on September 26.  (Hosp. Records, ECF No. 60-8 at Pg ID 1034.)  The lab report reflects a serum alcohol level of 54 milligrams per deciliter.  (*Id.*)  Defendants' medical toxicologist expert, Kirk Charles Mills, MD, indicates that this serum alcohol level is equivalent to a whole blood alcohol level of 46 milligrams per deciliter, also expressed as a blood alcohol concentration (BAC) of .046.  (Mills Report ¶¶ 32, 36, ECF No. 60-7 at Pg ID 1019.)  Applying scientific principles and his scientific knowledge, Mills concludes that Plaintiff's BAC at the time of the accident almost four hours earlier "most likely" was between 0.086 and 0.126.  (*Id.* ¶¶ 44-48, Pg ID 1020-21.)  Mills opines that Plaintiff's BAC level at the time of the incident was "more than sufficient to cause alcohol impairment" and that his "alcohol impairment was a major contributor to the accident[.]"  (*Id.* ¶¶ 55, 57, Pg ID 1022.)

Plaintiff's urine drug screen was also positive for cannabinoids, cocaine metabolite, and opiates.  Mills opines that the detection of cannabinoids in Plaintiff's urine is consistent with Plaintiff's admission that he had smoked

8

marijuana sometime before the day of the accident, but not that specific date.  (*Id.*
¶ 23, Pg ID 1017.)  According to Mills, the detection of opiates could have resulted
from the intravenous pain medication administered to Plaintiff at 1:52 a.m. in the
hospital's emergency room.  (*Id.* ¶¶ 17, 25, ECF No. 60-7 at Pg ID 1016-17.)
Mills indicates that the presence of the cocaine metabolite "is essentially
confirmatory of cocaine exposure because false positive urine cocaine tests are
exceedingly rare."  (*Id.* ¶ 28, Pg ID 1018.)  Mills provides that this metabolite can
be detected in the urine up to 96 hours after cocaine exposure.  (*Id.* ¶ 27, Pg ID
1018.)

According to David Anderson, a product safety engineer for TTI, the manual
for the Ryobi RY903600 generator repeatedly warns about the dangerous nature of
gasoline and its vapors, including that they are extremely flammable and explosive.
(Anderson Aff. ¶ 7, ECF No. 60-4 at Pg ID 973.)  Labels on the generator likewise
warn about gasoline hazards.  (*Id.*)  Anderson indicates that tipping the generator
with the fuel cap off is unsafe as it may cause gas to be expelled from the fuel tank.
(*Id.* ¶ 8, Pg ID 973.)  He states that this is an unforeseeable misuse of the generator
and unnecessary to check the fuel level.  (*Id.* ¶¶ 8, 10, Pg ID 973-74.)  According
to Anderson, neither TTI nor OWT had ever heard of such a practice for the
product.  (*Id.* ¶ 10, Pg ID 974.)  Anderson indicates that neither TTI nor OWT have
a record of any claim that the generator is defective due to instability, the lack of

an external gas gauge, the design of the handle, or the lack of stabilizing feet, and

that they are unaware of any claim or suit of injury from fuel spillover events.  (*Id.*

¶¶ 11-15, Pg ID 974.)  The lack of an external gas gauge, the design of the handle,

and the lack of stabilizing feet are design defects identified by Plaintiff's experts.

(*See* Cooke/Buc PowerPoint, ECF NO. 72-1.)

On September 18, 2019, Plaintiff, through counsel, filed this lawsuit in State

court against Home Depot, TTI, OWT, Ryobi Limited, and Ryobi Tools.  (Compl.,

ECF No. 1.)  TTI removed Plaintiff's Complaint to federal court on the basis of

diversity jurisdiction on October 21, 2019.  (Removal Notice, ECF No. 1.)

Plaintiff alleges two counts in his Complaint: (I) negligent design, and (II) breach

of implied warranty of fitness for a particular purpose and implied warranty of

merchantability.  (Compl., ECF No. 1.)  As indicated, only TTI and OWT remain

as defendants.

Defendants filed the pending summary judgment motion on June 16, 2021.

(ECF No. 60.)  On the same date, Defendants filed a motion to preclude Plaintiff

from calling as witnesses proposed experts Elizabeth Buc, Bradley Cook, Thomas

Patterson, and Robert Trenkle due to Plaintiff's failure to provide expert reports as

required under Rule 26 of the Federal Rules of Civil Procedure.  (ECF No. 62.)  In

the same motion, Defendants sought to preclude Plaintiff from calling any treating

physician to provide expert or lay testimony as he never identified any treating

10

physician in his initial disclosures or any witness list and never complied with Rule

26 with respect to any treating physician.  (*Id*.)  After full briefing and a hearing,

Magistrate Judge Grand granted in part and denied in part Defendants' motion.

(ECF No. 82.)  Magistrate Judge Grand ruled that Plaintiff could use Buc and

Thomas as experts, but not Patterson or Trenkle.  (*Id*.)  As to Plaintiff's treating

physicians, Magistrate Judge Grand held that Plaintiff could call his treating

physicians to testify as to their course of treating Plaintiff and what they observed

while he was under their care but that they could not testify as to causation or

provide any other expert opinions.  (*Id.*)  Defendants filed timely objections to the

extent Magistrate Judge Grand denied their motion.  (ECF No. 84.)

## III.    Defendants' Arguments for Summary Judgment

Defendants asserts that all of Plaintiff's claims are barred due to his

intoxication and impairment pursuant to Michigan Compiled Laws § 600.2955a

and due to unforeseeable misuse pursuant to Michigan Compiled Laws

§ 600.2947(2).  With respect to Plaintiff's design defect claim, specifically,

Defendants argue that Plaintiff cannot make out the required proofs because he

lacks expert testimony.  Defendants also argue that Plaintiff lacks evidence to

demonstrate the magnitude of the risk of the generator's existing design or the

likelihood of foreseeable injury as a result of that design, as well as proof of a

reasonable feasible alternate design.  With respect to Plaintiff's breach of implied

warranty claims—which are failure to warn claims—Defendants maintain that the

claims fail because: (i) Plaintiff cannot show that there was a duty owed; (ii) he

was aware of the danger; and (iii) he has no expert to establish causation.

Defendants assert that the failure to warn claims also fail under Michigan

Compiled Laws § 600.2947(3) because Plaintiff was aware that use of the

generator created an unreasonable risk of personal injury, he voluntarily exposed

himself to that risk, and the risk was the proximate cause of his injury.

Because Plaintiff fails to respond or adequately respond to Defendants'

impairment and misuse defenses, the Court's analysis begins and ends with them.

## IV.    Applicable Law & Analysis

### A.    Impairment Defense

Michigan Compiled Laws § 600.2955a(1) provides in relevant part:

> It is an absolute defense in an action for the death of an
> individual or for injury to a person or property that the
> individual upon whose death or injury the action is based had
> an impaired ability to function due to the influence of
> intoxicating liquor or a controlled substance, and as a result of
> that impaired ability, the individual was 50% or more the cause
> of the accident or event that resulted in the death or injury.

The statute defines "[i]mpaired ability to function due to the influence of

intoxicating liquor or a controlled substance" as follows:

> as a result of an individual drinking, ingesting, smoking, or
> otherwise consuming intoxicating liquor or a controlled
> substance, the individual's senses are impaired to the point that

the ability to react is diminished from what it would be had the individual not consumed liquor or a controlled substance. An individual is presumed under this section to have an impaired ability to function due to the influence of intoxicating liquor or a controlled substance if, under a standard prescribed by section 625a of the Michigan vehicle code, Act No. 300 of the Public Acts of 1949, being section 257.625a of the Michigan Compiled Laws, a presumption would arise that the individual's ability to operate a vehicle was impaired.

*Id.* § 600.2955a(2)(b).  Under Michigan law, a person with a BAC of 0.08 is presumed to be too impaired to operate a vehicle.[4]  Mich. Comp. Laws § 257.625a.

A defendant invoking the absolute defense of impairment must show that "(1) the [plaintiff] had an impaired ability to function due to the influence of intoxicating liquor or a controlled substance, and (2) that as a result of that impaired ability, the decedent was fifty percent or more the cause of the accident or event that resulted in his [injury]." *Harbour v. Corr. Med. Servs., Inc.*, 702 N.W.2d 671, 674 (Mich. Ct. App. 2005).  Defendants present evidence to show that Plaintiff's BAC level was over 0.08 at the time of the accident and his impaired ability to function is therefore presumed.[5]  Applying scientific principles and his scientific knowledge, Mills concludes that Plaintiff's BAC at the time of

---

[4] On October 1, 2021, the BAC level to be presumed impaired rose to 0.10 grams or more per 100 milliliters of blood.  Mich. Compl. Laws §  257.625(1)(b).  As the events at issue occurred in 2016, the Court believes the lower BAC level applies to this case.

[5] Mills also opines, however, that Plaintiff's functioning was impaired.

the accident almost four hours earlier "most likely" was between 0.086 and 0.126 (Mills Report ¶¶ 44-48, ECF No. 60-7 at Pg ID 1020-21.)  Notwithstanding Mills' non-definitive conclusion regarding Plaintiff's BAC at the time of the accident, Plaintiff fails to present evidence to dispute the BAC.  Mills further opines that, as a result of his impaired ability, Plaintiff was fifty percent or more the cause of the accident that caused his injuries.

Plaintiff fails to present evidence to rebut the presumption that he was impaired.  Plaintiff's only argument in response to Defendants' motion is that he "had the presence of mind, alertness, and analytical ability" to jump from the roof to the ground and "call out loud for help[.]".  Plaintiff fails to cite to any evidence, however, supporting the assertion that he intentionally jumped from the roof to save himself or called for help.  Plaintiff does not identify even a "scintilla" of evidence reflecting his "alertness" or "presence of mind" at the time of the accident.  The Court's own review of the record did not uncover such proof. Plaintiff also fails to address Defendants' evidence that his impairment was a "major contributor" to the accident that caused his injuries.

Because Plaintiff fails to present evidence to rebut the presumption that he was impaired and that, because of the impairment, he was 50% or more the cause of the accident, a question of fact does not arise and the Court must, as a matter of law, conclude that the intoxication defense precludes his claims.

**B.      Unforeseeable Misuse Defense**

Under Michigan law, a manufacturer or seller of a product is not liable for

injuries caused by the misuse of the product unless the misuse was reasonably

foreseeable.  Mich. Comp. Laws § 600.2947(2).  Where the defendant seeks to

invoke this statutory defense, the court first "must decide whether there was misuse

of the product" and then "decide whether that particular misuse was reasonably

foreseeable by the manufacturer."  *Iliades v. Dieffenbacher N.A., Inc.*, 915 N.W.2d

338, 340 (Mich. 2018).  Both questions "are legal issues to be resolved by the

court."  *Rutland v. R&R Trailers, Inc.*, No. 21-1181, 2021 WL 4847704, at *1 (6th

Cir. 2021) (quoting Mich. Comp. Laws § 600.2947(2)).

The Michigan legislature has provided a definition of "misuse":

> "Misuse" means use of a product in a materially different
> manner than the product's intended use. Misuse includes uses
> inconsistent with the specifications and standards applicable to
> the product, uses contrary to a warning or instruction provided
> by the manufacturer, seller, or another person possessing
> knowledge or training regarding the use or maintenance of the
> product, and uses other than those for which the product would
> be considered suitable by a reasonably prudent person in the
> same or similar circumstances.

Mich. Comp. Laws § 600.2945(e).  Although the legislature has not defined

"reasonably foreseeable," the Michigan Supreme Court in *Iliades* instructed that

"the crucial inquiry is whether, at the time the product was manufactured, the

manufacturer was aware or should have been aware, of that misuse."  915 N.W.2d

at 340. "Whether a manufacturer should have known of a particular misuse may depend on whether that misuse was a common practice, or if foreseeability was inherent in the product." *Id.* at 344 (footnotes omitted).

Defendants argue that Plaintiff misused the generator by tipping it, while the gas cap was off, and by operating it while impaired. (Defs. Br. in Supp. of Mot. at 5-6, ECF No. 60 at Pg ID 919-20, ¶¶ 27-30.) Anderson, TTI's product safety engineer, provides that the intended use of the generator does not include tipping or tilting it with the gas cap off and that "[i]t is and was not conceivable to TTI and OWT that a user would have to tip the generator to be able to see into the [fuel] tank." (Anderson Aff. ¶¶ 8-10, ECF No. 60-4 at Pg ID 973-74.) Anderson further states that "TTI and OWT have never heard of such a practice for this product." (*Id.* ¶ 10, Pg ID 974.) As Anderson explains, the top of the generator where the gas cap is located is only 18 inches from the ground. (*Id.*) A user, therefore, can observe the fuel level look simply by bending over and looking inside the tank. (*Id.*)

According to Anderson, TTI and OWT have no record of any claim or suit of injury arising from fuel spillover events for this generator. (*Id.* ¶ 15, Pg ID 974.) Further, the owner's manual for the generator explicitly warns against operating the generator when under the influence of alcohol and the intended use

does not include operating the generator while intoxicated.  (*Id*. ¶ 17, Pg ID 975;

*see also* Manual, ECF No. 60-6 at Pg ID 990.)

Plaintiff fails to respond to Defendants' arguments.  He does not contend

that he did not misuse the generator or that any misuse was foreseeable. [6]  The

word "misuse" does not appear in any of Plaintiff's response briefs.  (*See* ECF

Nos. 72-74.)

The Court concludes that Plaintiff misused the generator by tilting it with the

gas cap removed and by using it while impaired.  Such uses were contrary to the

manufacturer's warnings and instructions, which warned of the dangers and risk of

serious injury from gasoline and gasoline vapors and operating the generator while

impaired.  *See* Mich. Comp. Laws § 600.2045(e) (defining "misuse" to include

"uses contrary to a warning or instruction . . ."); *see also Iliades v. Dieffenbacher*

*N.A., Inc.*, No. 324726, 2018 WL 5275518, at *1 (responding to the plaintiffs'

---

[6] Notably, not only does Plaintiff fail to address the foreseeability of his asserted misuse, but he never specifically identifies the risk and foreseeable injury that would have been precluded by his experts' proposed alternate design.  His experts appear to be basing the need for an alternate design on a risk that a user will accidentally grab the generator's handle and cause the generator to tip and spill fuel.  However, the facts do not show that this was the risk that caused Plaintiff's harm.  In other words, Plaintiff's experts formed their opinions based on their understanding that Plaintiff became startled after seeing a flickering flame, jumped up to escape it, and grabbed the generator's upright handle, which caused the generator to accidentally tip and spill fuel.  (*See* Cooke/Buc PowerPoint at 6, ECF No. 72-1 at Pg ID 2330; *see also* Cook Report at 1; ECF No. 74 at Pg ID 2440.) As noted earlier, however, this version of the events is unsupported by the record.

argument that "at face value, the statute appears to absurdly construe *any* departure from explicit and formal operating instructions" as a "misuse" and indicating that the court is "constrained by plain and unambiguous language in a statute, absurd or not").

"Look[ing] to the record evidence," *Iliades*, 915 N.W.2d at 340, the Court can only conclude that such misuse was not reasonably foreseeable. Defendants' evidence shows that they were unaware of prior instances of such misuses of the generator. Plaintiff offers no argument, much less evidence, to enable the Court to conclude otherwise. *See Rutland*, 2021 WL 4847704, at \*2 (citing *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 406 (6th Cir. 1992) ("Rule 56 requires the non-moving party to do its own work, and to assist the trial court by responding to the motion, pointing out as specifically as is reasonably possible facts that might demonstrate the existence of genuine issues."); *see also Guarino*, 980 F.2d at 406 ("[I]t seems to us utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion. Such a role would carry the court far beyond simply reviewing evidence in 'the light most favorable to the non-moving party,' or giving effect to inferences reasonably arising from the designated evidence."). The opinion of Plaintiff's experts that the generator was defectively designed because it lacked an external

gas gauge and stabilizing feet and had an upright handle, and evidence that a number of other model generators were designed differently, is not evidence that Plaintiff's misuse was reasonably foreseeable.

## V.   Conclusion

The record reflects that Plaintiff suffered severe burns as a result of the September 25, 2016 accident involving the subject generator and that Plaintiff's injuries have impacted him physically and emotionally.  While the Court is sensitive to the harm Plaintiff suffered, he fails to present evidence—and as to some issues, even arguments—in response to Defendants' assertions that they cannot be held liable for Plaintiff's injuries due to his impairment at the time of the accident and misuse of the generator.  This is the case despite the Court's liberality in allowing Plaintiff to file three response briefs, including two which were submitted beyond the already extended deadline for Plaintiff to respond to the summary judgment motion.

Accordingly,

**IT IS ORDERED** that Defendants' motion (ECF No. 76) to strike Plaintiff's response briefs is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment Pursuant to Rule 56 (ECF No. 60) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Objections (ECF No. 84)

to Magistrate Judge Grand's September 16, 2021 Order (ECF No. 82) are

**DENIED AS MOOT**.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 9, 2022